UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 06-81054 -MIDDLEBROOKS/JOHNSON

LEVENGER COMPANY,
a Florida Corporation,

               Plaintiff,

v.

JACOBO (JACK) FEDLMAN, et al

               Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is an action for patent invalidity, patent unenforceability, patent non-infringement, trade dress infringement, misappropriation of trade secrets, breach of a license agreement, and other equitable relief.  The matter came before the Court upon a bench trial held from August 25, 2007, to August 29, 2007, on Plaintiff s Amended Complaint (DE 8), filed January 16, 2007, and Defendant's Counterclaims (DE 21), filed March 21, 2007.  Having reviewed the evidence, counsels' argument, and the parties' submissions, the Court finds in favor of Plaintiff on some of its claims and for Defendants on one of its claims for the reasons stated below.


**I. Background**


Levenger Company, the Plaintiff in this case, is a Florida corporation that is in the business of selling high-end disk-bound notebooks and accessories, among other reading and

writing tools.  Jack and Shirley Feldman, two of the Defendants in this case, are a husband and wife team residing in Florida who in addition to manufacturing and distributing disk-bound notebooks through their company Rollabind, LLC, are also the owners of the patents at issue in this dispute.   In 1995, Defendants, Jack and Shirley Feldman, obtained two patents relating to a notebook system.  In early 1996, Defendants began supplying Plaintiff with notebooks for retail pursuant to an oral agreement between the two parties.  In July of 2004, the parties entered into a written contract ("the License Agreement").  In this license agreement, Defendants agreed to allow Plaintiff to manufacture the notebooks in exchange for royalties.  In July of 2006, Plaintiff stopped paying Defendants the royalties and commenced this action in November of 2006.  In this action, Plaintiff seeks a declaration of patent invalidity, patent unenforceability, patent non-infringement, as well as an injunction against trade dress infringement and other equitable relief. Defendants counterclaim that Plaintiff has breached the license agreement, misappropriated trade secrets, and willfully infringed on their patents.  Both parties seek an equitable accounting. Pursuant to Rule 52(a), Federal Rules of Civil Procedure, the Court now makes the following findings of fact and conclusions of law.  Fed. R. Civ. P. 52(a).


## II. Findings of Fact


Jack Feldman moved to Israel in 1991 seeking business opportunities.  While living there he came across the product line "Flic" which was manufactured by an Israeli company called Mapal Plastics.  One of its products was a disk-bound notebook system, wherein paper is bound together using circular disks which are inserted into mushroom-shaped slots along the edge of the

paper (the "Flic notebook").  The slots have a narrower stem portion and a larger bulbous opening portion; the bulbous opening portion comprises an arcuate or curved top portion and a substantially flat bottom portion, extending from and perpendicular to the stem portion.  Mr. Feldman founded a company called Flic Distributors, Inc., and he and his wife began distributing the Flic products.  The Feldmans then moved to the United States in 1992, and Mr. Feldman changed the name of the company from Flic Distributors, Inc., to Flic Industries, Inc. The company began importing and selling the Flic products to stores in the United States and eventually got involved in manufacturing them as well.  Catalogs containing the Flic notebook were publicly available in the United States prior to June of 1994, as evidenced in the Flic 'N Roll trademark application, filed by Mapal Plastics with the United States Patent and Trademark Office ("USPTO") on July 28, 1993.

Jack and Shirley Feldman received numerous complaints from the stores they sold the products to that the Flic notebooks did not work properly because the paper would fall out of the notebook and the paper did not move easily around the disks.  In response to these complaints, the Feldmans made improvements to the product.  As far as the Court can tell, these improvements appear to be minor and mostly have to do with changing the dimensions of the disks and the mushroom-shaped openings.

In June of 1995, Jack and Shirley Feldman filed a patent application with the USPTO. They sought to patent the improvements they had made to the Flic notebook.  On September 10, 1996, the USPTO issued to the Feldmans Patent No. 5,553,959 (the "959 Patent").  On May 12, 1998, the USPTO issued to the Feldmans Patent No. 5,749,667 (the "667 Patent").  Both patents relate to the same notebook system at issue in this case: the 959 Patent addresses the notebook

itself and the 667 Patent addresses the sheet refills for the notebook.  Both patents also address a strap that wraps around the notebook which is not at issue in this case and therefore will not be discussed.

Claims 1-4 of the 959 Patent refer to a notebook system including a plurality of sheets where each sheet has a plurality of mushroom-shaped openings or slots.  These slots have a narrower stem portion and a bulbous opening portion which includes an arcuate or curved top portion and a substantially flat bearing surface, extending from and substantially perpendicular to said stem portion (the mushroom shape).  These claims also require a plurality of binding disks to be inserted into the slots, each disk having a substantially flat central surface portion and a continuous projecting rim portion perpendicular to the central surface portion.  The rim has an arcuate exterior shape and the disk is sized to fit in the slots.  Claims 1-4 of the 959 Patent also restrict the amount of pages to be used in the notebooks.  The radius of the central portion of the disk must be greater than the thickness of the stack of sheets inserted into the notebook.

Claims 1,2, and 9 of the 667 Patent are a plurality of refill sheets, where each sheet is pre-punched with a plurality of the mushroom-shaped slots. Claims 1, 2, and 9 also refer to the fact that the disks are insertable into the slots, but do not claim the disks as part of the invention.

 The Feldmans hired an attorney named Leonard Holtz from Frishauf, Holtz, Goodman, Langer & Chick, a New York law firm, to help them with the patenting process.  Mr. Feldman claims he provided his attorney with samples of the Flic notebook upon which he and his wife based their invention.  However, the Flic disk and slot that most resemble the claimed invention do not appear as relevant prior art in the patents.  Instead what may be another Flic disk and slot appear in Figures 6 and 7 of the patents.  The Flic disk appearing in the patents as relevant prior

art contains raised bumps on the inside portion of the disk and the slot is an oval shape.  There were other Flic disks and slots available, and observed by this Court and various witnesses, that did not contain the raised bumps and had a mushroom-shaped slot, akin to the claimed invention. Moreover, it was established during trial that the description of the 959 and 667 Patents contained in the "claims" section of their patents matched a description of the Flic notebook which had not been revealed to the USPTO.

The Feldmans claim that their failure to disclose the more relevant Flic notebook was an innocent mistake.  As evidence, they point to the fact that they disclosed their affiliation with Flic Industries, Inc., on a Verified Statement Claiming Small Entity Status form which was signed and dated by the Feldmans and appears in the file histories of the patents.  The Feldmans also claim to have very little knowledge of patent law. Mr. Feldman stated that he handed over the information to his attorney and his attorney handled everything.  The problem with this argument is that, in their patent applications, the Feldmans signed a declaration under oath stating that they had read their patent application, they understood the application, and they acknowledged the duty to disclose prior art which was material under Rule 56 (i.e., 37 C.F.R. § 1.56).

Whether innocently omitted or not, the Feldmans' patent application also fails to reveal other relevant prior art.  The most significant omission is Spanish Patent No. 295,374 to Comercial Milos, S.A., published in December of 1986 (the "Milos Patent").  The Milos Patent contains a single similar mushroom-shaped disk inserted onto a mushroom-shaped slot along the side of a stack of paper.  Instead of discussing the Milos patent, Italian patent 625,130 (the "Camarda Patent") appears in Figures 4 and 5, as relevant prior art.  The Camarda Patent is similar to the Feldmans' patent, except that the arcuate surface of the slot and disk have flattened

5

sides before meeting the bearing surfaces.  The attorney who drafted the patent application distinguishes the Feldmans' invention from the Camarda Patent by pointing to these flattened sides.  This distinction shows up in the description of the patent.  Thus the two pieces of prior art discussed in the patent—the Camarda Patent and the less-relevant Flic product— are not as similar to the claimed invention as other pieces of prior art in existence at the time of the patent application.

Sometime in late 1995 or early 1996, Jack Feldman and Levenger met and entered into a business arrangement.  Feldman, through Flic Industries, Inc., began manufacturing notebooks for Levenger.  Feldman represented to Levenger that he either had patents on the notebooks or was in the process of obtaining patents on the notebooks and that no other company in the United States could sell the patented notebooks.  In its Spring 1996 catalog, Levenger began advertising the notebook products that Feldman manufactured.  The line of products was called "Circa."  The Circa line is doing very well today, and in particular the disk-bound notebooks sold in the Circa line are one of Levenger's signature products.  These Circa notebooks, in addition to using the patented notebook system, are leather-bound and contain stitching along the edges.  Each sheet of paper inserted in the Circa notebooks has a box design on them which Levenger claims is distinctive.  Levenger has obtained trade dress rights in the appearance of its Circa notebooks.

Initially, Levenger made payments for the notebooks to Flic Industries, Inc..  The company changed names and owners several times, with Jack Feldman's involvement remaining a constant.  In April 1996, Flic Industries, Inc., became Rollabind, Inc.  In 2002, Rollabind Inc., became Rollabind, LLC.  In 2004, Defendant Shirja, Inc., was formed and is now the owner of the Rollabind trademark and has been assigned the rights to the 959 and 667 Patents.  Over the

years, the Circa products manufactured by the Feldmans did well in the market.  However, Levenger was not completely satisfied with the business arrangement.  There were many supply disruptions and other inefficiencies and Levenger began considering bringing manufacturing capabilities in-house to cut down on these problems.

On July 1, 2004, Jack and Shirley Feldman entered into a License Agreement with Levenger that would allow Levenger to manufacture the Circa notebooks.  The License Agreement granted the Levengers certain rights in the Feldmans' patented notebook system.  It granted Levenger the exclusive right to manufacture, distribute, and sell high-end disk-bound notebook products, including but not limited to products that used leather and heavy weight paper; all other rights were non-exclusive.  This meant that the Feldmans were free to enter into licensing agreements with other businesses and individuals for low-end disk-bound notebooks. At this point, the Feldmans decided to discontinue their manufacturing operations.  Levenger's attorneys drafted the License Agreement.  The License Agreement contained a warranty disclaimer, stating that "the agreement shall not be construed as a warranty or representation by the Feldmans as to the validity or scope of any right included in the Licensed Patents." The License Agreement also contains a merger clause.  The License Agreement required that Levenger make royalty payments to the Feldmans ranging between eight and ten percent (8% & 10%) of all Circa product sales.[1]

In the fall of 2004, Levenger approached Sun Graphix, a division of Geiger Bros. that manufactures paper products in Maine, to manufacture Circa products for them.  Sun Graphix

---

[1]The range depends on the following schedule: eight percent (8%) of the first two and a half (2.5) million of net retail sales, nine percent (9% ) of the next half (2.5-3.0) million after that, and ten percent (10%) of any sales over three (3) million.

had been manufacturing unrelated products for Levenger since 1995 and had been supplying

Rollabind with un-punched paper since 1999.  Ronald Giard, an Executive Vice President at

Geiger Bros., testified that in order to make these Circa products, Sun Graphix initially used

Levenger's inventory and then went to a Chinese company called Long Tech which it had been

doing business with since 2002.

In June of 2005, Sun Graphix entered into an Equipment Agreement with Jack and

Shirley Feldman.  The Equipment Agreement required Sun Graphix to purchase seven machines

from the Feldmans.  These machines were to be used in assembling the paper onto the disks.  In

addition to buying the seven machines, the Equipment Agreement also required Sun Graphix to

pay a royalty of one percent (1%) based on net sales for all products sold to Levenger that use the

patented notebook system, independent of whether the seven machines would be used.  The

Equipment Agreement also warrants that the Feldmans are the sole owners of the notebook

system patents.  It warrants this, even though the seven machines themselves are patented

inventions of Helver which were licensed to Rollabind.  Mr. Giard testified that the seven

machines did not work properly, were not used by Sun Graphix, and were eventually returned to

the Feldmans earlier this year.  Sun Graphix continues to pay its royalty to the Feldmans for all

products sold to Levenger that use the patented notebook system.

During this period of time, when manufacture of the Circa product was transferred from

Rollabind to Sun Graphix, Mr. Feldman claims that he provided Levenger with a variety of

confidential trade secrets, all of which related to the manufacture of the patented notebook

systems.  To the best of the Court's understanding, the claimed trade secrets appear to be Mr.

Feldman's knowledge about the best type of plastic to be used in making the disks, the best type

of mold to be used in making the disks, a special way that the plastic is delivered into the mold, the identities of the best suppliers for various materials in the industry, and other specifications. Mr. Feldman did not provide any more specificity or clarification to his claims, except to tell the Court that the plastic was ABS plastic. This kind of plastic was already being used by Sun Graphix's Long Tech suppliers. Mr. Feldman also claimed that various diagrams had been provided to Levenger and so he no longer had them.

Early in 2006, the relationship between Levenger and the Feldmans began to sour. Around this time, Levenger discovered products similar to its Circa line on sale at Staples and Target and felt that this was a breach of its trade dress rights. Levenger also believed that the Feldmans were misusing their patents by charging Sun Graphix a royalty for all products supplied to Levenger. Subsequent investigation led Levenger to believe that the Feldmans' patents were invalid based on prior art. In July of 2006, Levenger sent the Feldmans their last royalty payment and on November 10, 2006, Levenger informed the Feldmans of its intent to file this lawsuit. On November 14, 2006, Levenger filed this lawsuit. The next day, Levenger sent the Feldmans a letter terminating the License Agreement, effective December 31, 2006. To date, Levenger continues to manufacture and sell its Circa products, including the popular notebook system.

**III. Conclusions of Law**

A. Patent Invalidity

In this action, Levenger seeks a declaration of patent invalidity. Levenger argues that the

Feldman Patents can be invalidated on three separate grounds: (1) anticipation by prior art, (2) obviousness, and (3) best mode.  Defendants counter that Levenger has not met the evidentiary standard for proving patent invalidity.  In patent validity actions, a patent is presumed to be valid and the party challenging a patent's validity has the burden of proving the invalidity by clear and convincing evidence.  *See* 35 U.S.C. § 282; *Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C.,* 482 F.3d 1347, 1357-58 (Fed. Cir. 2007) (*citing U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1564 (Fed. Cir. 1997)).  After considering the testimony, evidence, and the parties findings of fact and conclusions of law, I find that Levenger has established by clear and convincing evidence that the 959 and 667 Patents are invalid due to both anticipation by prior art and obviousness.

1. Invalidity Due to Anticipation by Prior Art

First Levenger argues that the Feldman Patents can be invalidated due to anticipation by prior art.  A patent is rendered invalid as anticipated, where the claimed invention "was patented or described in a printed publication in this or a foreign country or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b);  *see In re Omeprazole Patent Litigation*, 490 F. Supp. 2d 381, 510 (S.D.N.Y. 2007).  In order to show that a claim is invalid due to anticipation by prior art, a party must prove "that all of the elements and limitations of the claim are found within a single prior art reference." *Scripps Clinic & Research Foundation v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed. Cir. 1991) (citation omitted).  There can be no difference between the claimed invention and that single prior art reference, as viewed by a person of ordinary skill in the field of the invention.  *Id.*

The Flic notebook is prior art that the USPTO did not consider during its examination of the 959 and 667 Patents.  The Flic notebook was on sale in this country more than a year before the Feldmans filed their patent applications.  In the Flic 'N Roll trademark application, dated July 28, 1993, the Flic notebook is displayed.  Additionally, the Feldmans themselves testified that they began selling the Flic products in the United States when they moved here in 1992 and that complaints they received from consumers are what inspired them to make improvements to the Flic product.

The Flic notebooks' disks are exactly as described in the language of Claims 1-4 of the 959 Patent.  Just like the 959 Patent, the Flic notebook contains a plurality of binding disks inserted into the slots of the plurality of sheets, where each disk has a substantially flat central portion with no raised portions and a continuous projecting rim portion that has an arcuate shape and is sized to fit in the slots.

The Flic notebooks' sheets of paper are also exactly as described in the language of Claims 1, 2, and 9 of the 667 Patent.  Just like the 667 Patent, the Flic notebook includes a plurality of sheets with each sheet having a plurality of mushroom-shaped slots.  These slots have a narrower stem portion and a larger bulbous opening portion, where the bulbous opening comprises a substantially arcuate top portion and a substantially flat bottom portion, extending from and perpendicular to the stem.

The Defendants argue that the Patents cannot be invalidated based on anticipation by prior art because they made improvements to the Flic notebook.  These improvements include changes to the dimensions of the disk, slot, and to the thickness of the stack of paper.  Only the latter measurement relating to the thickness of the stack of paper is actually described in the

11

Patents' claims; all other measurements are not described in the Patents' claims and cannot pose

any barrier to a finding of anticipation by prior art.  With regard to the thickness of the stack of

paper, I am not convinced that a person of ordinary skill in the field of the invention would view

this as a difference between the Flic notebook and the Patents' claims, especially since the sheets

of paper are removable in both.  Therefore, I conclude that by clear and convincing evidence,

Claims 1, 2, and 9 of the 667 Patent and Claims 1-4 of the 959 Patent are invalid under 35 U.S.C.

§ 102 as being anticipated by the Flic notebook.


2. Invalidity Due to Obviousness

        Even if the Feldman Patents are not identical to the prior art, they can still be invalidated

on the ground that prior art rendered whatever changes the Feldmans made obvious.  In order to

show that a claim is invalid due to obviousness, the challenger must prove that the differences

between the invention and the prior art "are such that the subject matters as a whole would have

been obvious at the time the invention was made to a person having ordinary skill in the art to

which said subject matter pertains."  35 U.S.C. § 103(a); *see also In re Omeprazole Patent*

*Litigation,* 490 F. Supp. 2d 381, 515 (S.D.N.Y. 2007).  Whether the invention was obvious under

§ 103 is a legal conclusion based on certain factual inquiries, including: (1) the level of ordinary

skill in the art; (2) the scope and content of the prior art; (3) the differences between the claimed

invention and the prior art; and (4) secondary, objective considerations of non-obviousness

including long-felt need, commercial success, or the failure of others. *Id. (citing Graham v. John*

*Deere Co.,* 383 U.S. 1, 17-18 (1966); *Jones v. Hardy,* 727 F.2d 1524, 1529 (Fed. Cir. 1984).

        The only articulated difference between the Feldman Patents and the Flic notebook is the

thickness of the stack of paper. Claims 1-4 of the 959 Patent state that the thickness of the stack of paper inserted around the disks must not exceed the radius of the central portion of the disks. In other words, the notebook should be less than half full.  Relying on the expert testimony of Mr. Potemri and Mr. Hoffman, I find that it would be obvious to one of ordinary skill in the notebook arts to change the thickness of the stack of paper.  A person designing a notebook system would have known that increasing the size of the binding disk or decreasing the thickness of the stack of paper are well-known methods for allowing pages in a notebook with disk binding to turn more easily.

The differences between the Feldman Patents and the Milos Patent are also obvious. Here, the only discernible difference, in addition to the thickness of the stack of the paper, is that the Milos Patent depicts a single disk and a single slot rather than multiple disks and slots.  Using multiple disks and slots as opposed to a single disk and slot is an obvious variation which is disclosed in many other prior art references involving notebook and binding systems.   Relying on the expert testimony of Mr. Potemri and Mr. Hoffman, I find that the use of multiple slots is taught in many other prior art references, including the Flic notebook itself and would, therefore, be obvious to one of ordinary skill in the notebook arts to make this change.

Defendants point to the success of their patented notebook system to dispute the invalidity based on obviousness claim.  However, the Defendants fail to present sufficient evidence to show that their commercial success is attributable to any claimed invention in their patents, as opposed to marketing techniques and other business deals.  After considering the testimony, evidence, and the parties findings of fact and conclusions of law, I find that Levenger has established by clear and convincing evidence that the 959 and 667 Patents should be

13

invalidated because any differentiating "invention" would have been obvious to a person of ordinary skill in the art.

### 3. Invalidity due to best mode

Levenger's third argument is that the Feldman Patents can be invalidated due to the Feldmans' failure to disclose the best mode for carrying out their invention. Under 35 U.S.C. § 112, inventors have a duty to disclose in their patents the best mode for carrying out their inventions. *Chemcast Corp. V. Arco Industries Corp.,* 913 F.2d 923, 928 (Fed. Cir. 1990). The purpose of the best mode requirement is to prevent inventors from being able to both have patent protection over their invention, while at the same time keeping secret the best method of practicing the inventions. *See Festo Corp. V. Shoketsu Kinzoku Kogyo Kabushiki Co. Ltd.,* 535 U.S. 722 (2002). Having found the Feldman Patents invalid on two grounds already, the Court finds it unnecessary to address this claim.

For the reasons set forth above, I find that Claims 1-4 of the 959 Patent and Claims 1,2, and 9 of the 667 Patent are invalid based on anticipation by prior art and obviousness.

### B. Patent Unenforceability

Levenger also argues that the Feldman Patents, in addition to being invalid, are also unenforceable on the following two separate grounds: 1) because of the Feldmans' inequitable conduct before the USPTO, and 2) because the Feldmans misused their patents by violating the patent exhaustion doctrine.

14

1. Unenforceability due to defendants' inequitable conduct during the patent application process

The Feldman Patents, even if valid, are unenforceable because the Feldmans engaged in inequitable conduct before the USPTO by failing to disclose the more relevant Flic notebook to the USPTO.  Despite my finding of patent invalidity, it is necessary to address the merits of this challenge to the Feldman Patents as a finding of unenforceability on these grounds impacts the analysis of other claims made by the parties, including any refund of royalties paid and attorneys fees owed to Levenger.

Patent applicants have a duty to treat the USPTO with candor and good faith, which includes the duty to disclose information known to the applicant to be material to patentability. 37 C.F.R. § 1.56(a) (2004); *see also Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).   Inequitable conduct may be found when a patentee or his attorney breaches this duty of disclosure by failing to disclose material information with the intent to mislead or deceive. *Molins PLC* 48 F.3d at 1178.  As a threshold, the challenger must prove two prongs: 1) that the information withheld was material and 2) that the withholding was done with an intent to deceive.  *See Molins PLC* 48 F.3d at 1178 (*citing Allen Organ Co. v. Kimball Int'l,* 839 F.2d 1556, 1567 (Fed. Cir. 1988).  Once these threshold findings of materiality and intent are established, the Court must then weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred. *Id. (citing J.P. Stevens & Co. v. Lex Tex, Ltd.,* 747 F.2d 1553, 1559-60 (Fed. Cir. 1984)).   The more material the withheld information is, the less important it is for the challenger to prove the strength of the intent prong.  *Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc.,* 438 F.3d 1123, 1128-29 (Fed. Cir. 2006).  The effect of a finding of inequitable conduct is that the patent becomes unenforceable as a whole. *Kingsdown Medical*

*Consultants, Ltd. V. Hollister, Inc.,* 863 F.2d 867, 877 (Fed. Cir. 1988) (*en banc* resolution of conflicting precedent).  Levenger bears the burden of proving these elements by clear and convincing evidence.  *Honeywell Intern. Inc. v Universal Avionics Systems Corp.,*  488 F.3d 982, 999 (Fed. Cir. 2007) (*citing Glaxo Inc. v. Novopharm Ltd.,* 52 F.3d 1043, 1048 (Fed. Cir. 1995)).


     As discussed above, the Feldmans failed to disclose the more relevant Flic notebook and instead disclosed a less relevant Flic product with raised lettering on the disk and oval-shaped slots.  While the Feldmans also did not disclose the Milos Patent, there is no proof that they were aware of the Milos Patent.  There is, however, proof that the Feldmans were aware of the Flic notebook since they were in the business of distributing it and admitted that their Patents were based on improvements made to it.

     In order for withheld information to be deemed material, the Court must find that the withheld information is not cumulative of information on record with the USPTO and either establishes a prima facie case of unpatentability of a claim or it refutes, or is inconsistent with, a position asserted in order to obtain a patent.  *See Purdue Pharma, L.P. v. Endo Pharms. Inc.,* (Fed. Cir. 2006) (*quoting* 37 C.F.R. § 1.56(a)).   The existence of the Flic notebook was material information.  First, the Flic notebook is not cumulative of the prior art that was revealed.  The prior art that was revealed to the USPTO does not contain a mushroom-shaped disk inserted in a mushroom-shaped slot; it only reveals a mushroom-shaped disk inserted in an oval-shaped slot and a disk and slot that have flattened sides.  Moreover, the Flic notebook is inconsistent with a position taken by the Feldmans and their attorney during the examination process.  The Feldmans and/or their attorney rely on the novelty of having both a mushroom-shaped disk and a

16

mushroom-shaped slot in making their case for why their invention should be patented.

A Court may infer a patentee's intent to deceive the USPTO from looking at the surrounding circumstances. *See LaBounty Mfg. Inc. v. U.S. Int'l Trade Comm'n.,* 958 F.2d 1066 (Fed. Cir. 1992). The Feldmans' intent to mislead or deceive the USPTO can be inferred from the fact that the Feldmans disclosed less relevant prior art, the fact that the Feldmans and their attorney specifically argued that the prior art failed to show a mushroom-shaped configuration of slots, and the absence of a credible explanation for their non-disclosure of the Flic notebook. *See Brasseler, U.S.A. I., L.P., v. Stryker Sales Corp.,* 267 F.3d 1370, 1380 (Fed. Cir. 2001) (evidence that the party acted in bad faith in combination with a lack of evidence that the party acted in good faith contributed to the Federal Circuit affirming a finding of inequitable conduct).

Intent may also be inferred where a patent applicant knew, or should have known, that withheld information could be material to the USPTO's consideration of the patent application. *See Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1375-76 (Fed. Cir. 2001). Because the Flic notebook was the starting point upon which the Feldmans based their invention, they knew or should have known that this information would be material.

The Feldmans argued that they handed over the Flic notebook to their patent attorney and that its absence from the patent examination is an inexplicable and innocent mistake. They also point to the fact that their company's name "Flic Industries, Inc." is revealed on the Verified Statement Claiming Small Entity Status, and argue that if they were trying to intentionally deceive the USPTO about the Flic notebook, they would not reveal the name of the company that was distributing it. However, this argument does not help Defendants very much because both parties agree, and cases addressing this issue appear to support the notion, that the inequitable

conduct of a patentee's attorney is imputed to the client.  *See Brasseler U.S.A. I, L.P. v. Stryker Sales Corp.,* 93 F.Supp.2d 1255, 1260 (S.D.Ga. 1999).  Thus, even if the Feldmans did not have the intent to deceive the USPTO, their Patents could still be found unenforceable based on what would now appear to be their attorney's inequitable conduct.  It is possible that their attorney lacked the requisite intent to deceive and merely made a mistake, but since the Defendants have claimed the attorney-client privilege regarding the patent application process, the Court has very little evidence to make such a determination of innocent mistake.

There are limited explanations for the Feldmans or their attorney's behavior – they either intentionally deceived the USPTO or they made a mistake.  It seems more likely in the Court's opinion that there was intentional deceit.  Also, in light of the fact that the materiality prong is strong, the intent prong need not be as strong.  *See Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc.,* 438 F.3d 1123, 1128-29 (Fed. Cir. 2006).  I find that the Feldman Patents, in addition to being invalid, are also unenforceable due to the inequitable conduct before the USPTO.[2]

---

[2]Levenger presents a second ground on which the Court can find the Patents unenforceable. Levenger argues that the Patents are unenforceable due to patent misuse.  Levenger bases its claim for patent misuse on a violation of the patent exhaustion doctrine: Levenger claims that the Defendants "double dipped" on their patent by obtaining a royalty from both Sun Graphix and Levenger on the same product.  The patent exhaustion doctrine prohibits patent owners from obtaining double royalties on products that have been placed into the market through an unconditional sale.  *See Bloomer v. Millinger,* 68 U.S. (1 Wall.) 340, 350-51 (1864); *Jazz Photo Corp. V. U.S. Int'l Trade Comm'n,* 264 F.3d 1094, 1105 (Fed. Cir. 2004); *Cyrix Corp. V. Intel. Corp.,* 846 F. Cupp. 522, 538-39 (E.D. Tex. 1994) *aff'd* 42 F.3d 1411 (Fed. Cir. 1994). Defendants argue that the Sun Graphix royalty was not a violation of patent exhaustion doctrine because the initial sale between Sun Graphix and Levenger was conditional (Sun Graphix could only sell the product to Levenger).  Moreover, Defendants argue that Plaintiff failed to show that the Defendants obtained an unfair commercial advantage through their "double dipping," another requirement of the doctrine.  *See C.R. Bard, Inc. V. M3 Systems, Inc.,* 157 F.3d 1340, 1372-73 (Fed. Cir. 1998).  While I am inclined to agree with Defendants on these claims, I decline to

Because the Court finds that Claims 1-4 of the 959 Patent and Claims 1, 2, and 9 of the 667 Patents are both invalid and unenforceable, Defendants' counterclaim for infringement of the patents fails.  There can be no infringement of a patent if the patent is both invalid and unenforceable.  Plaintiff does not owe Defendants a reasonable royalty for any infringement and Plaintiff is not enjoined from continuing to manufacture and sell its Circa products.

C. Trade Secrets

Defendants counterclaimed that Levenger misappropriated its trade secrets by continuing to use certain information in manufacturing and assembling products that were covered by the License Agreement after termination of the License Agreement.  Specifically, Defendants countered that the License Agreement encompassed not only rights to their patents, but also rights to their "know how," i.e. information and processes necessary to manufacturing the patented product, and that such know-how constituted trade secrets entitled to protection.  Under Florida's Uniform Trade Secrets Act, a trade secret consists of information that (1) derives economic value from not being readily ascertainable by others and (2) is the subject of reasonable efforts to maintain its secrecy.  *See* FLA. STAT. §§ 688.002(4).  Information that is generally known or readily accessible to third parties cannot qualify for trade secret protection.  FLA. STAT. §§ 688.002(4)*; see American Red Cross v. Palm Beach Blood Bank, Inc*., 143 F.3d 1407, 1410 (11th Cir. 1998).  For there to be actionable misappropriation, the party asserting trade secret protection bears the dual burden of describing the alleged trade secret information and also

address this issue in further detail as I have already found the Patents unenforceable and I do not see how a finding either way impacts the analysis of other claims made by the parties.

19

showing that it has taken reasonable steps to protect this secrecy.  *See American Red Cross v. Palm Beach Blood Bank, Inc*., 143 F.3d 1407, 1410 (11th Cir. 1998).  The party asserting trade secret protection cannot claim trade secret privilege.  *Del Monte Fresh Products Co. v. Dole Food Co.,* 148 F. Supp. 2d 1322, 1324 (S.D. Fla. 2001) (granting motion to compel discovery about the alleged trade secrets).  Rather the party asserting trade secret protection must describe the allegedly misappropriated trade secrets with reasonable particularity.  *Id.* at 1325.

The alleged trade secrets are all extremely vague and all attempts to clarify have been in vain.  As discussed above, the trade secrets appear to be the following: Mr. Feldman's knowledge about the best type of plastic to be used in making the disks, the best type of mold to be used in making the disks, a special way that the plastic is delivered into the mold, the identities of the best suppliers for various materials in the industry, and perhaps other measurements.  Mr. Feldman, in his testimony, did not provide any more specificity or clarification to his claims, except to tell the Court that the best type of plastic was ABS plastic.  But according to other credible testimony, this kind of plastic was already being used by Sun Graphix's Long Tech suppliers.  Mr. Feldman also claimed that various diagrams containing trade secrets had been provided to Levenger and so he no longer had them in his possession and could therefore not tell the Court what they are.  I find that Defendants have failed to meet their burden of describing their trade secrets with reasonable particularity.  Moreover, I am not convinced that some of these alleged trade secrets are not readily ascertainable by others through reverse engineering.  Therefore, Defendants' Counterclaim for misappropriation of trade secrets fails.

Thus far, I have found that the Feldman Patents are invalid due to anticipation by prior

20

art, invalid due to obviousness, and unenforceable due to inequitable conduct before the USPTO, and that, therefore, there has been no patent infringement.  Additionally, Levenger has not misappropriated any of Defendants' trade secrets.

D. Trade Dress

I now turn to Levenger's claim that both the stitching around the outside of the covers on its Circa notebooks and the box design on the paper inside constitute protected trade dress and that Defendants have infringed on this trade dress by selling notebooks with similar designs to Target and Staples.  Levenger seeks a preliminary injunction against Defendants for this alleged infringement.

Levenger brings its claim for trade dress infringement under Section 43 of the Lanham Act, 15 U.S.C. § 1125, and under Florida's unfair competition common law.  *See Carnival Corp. V. SeaEscape Casino Cruises, Inc.,* 74 F.Supp.2d 1261, 1264 (S.D.Fla. 1999).  In order to prevail on a trademark infringement claim, the plaintiff must prove (1) that trade dress of the two products is confusingly similar, (2) that the features of the trade dress are primarily non-functional; and (3) that the trade dress is inherently distinctive or has acquired secondary meaning.  *See Epic Metals Corp v. Souliere*, 99 F.3d 1034, 1038 (11th Cir. 1996).  All three elements are necessary for a finding of trade dress infringement and any one of them could be characterized as a threshold.  *See id.* at 1039.  It should be noted that the plaintiff bears the burden of proof on all three elements.  *See Seed Lighting Design Co., Ltd. v. Home Depot,* 2005 WL 1868152, at *11 (N.D. Ca. 2005) (*citing Clicks Billiards, Inc. V. Sixshooters, Inc.,* 251 F.3d 1252, 1258 (9th Cir. 2001).

21

With this in mind, I note that even if Levenger could establish the first and second prongs, its claim would have to fail under the third prong.  The third prong requires the plaintiff to prove that the trade dress is either inherently distinctive or has acquired secondary meaning. In assessing inherent distinctiveness, the Eleventh Circuit has held that district courts should consider the following factors in their examination: (1) whether the trade dress is a common basic shape or design (2) whether the trade dress is unique or unusual in a particular field and (3) whether the trade dress is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods.  *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1536 (11th Cir. 1986).

Levenger argues that, as a matter of law, it is entitled to a finding that the border stitching is inherently distinctive because it has obtained a design patent protecting its stitching design. *See* U.S. Design Patent No. 404,762, Plaintiff's Exh. 75.  The Court finds this argument to be misleading and unsupported by case-law.  Levenger cannot use its design patent to create a presumption of inherent distinctiveness.  In order to qualify for a design patent, the features do not need to be inherently distinctive; they only need to be new, non-obvious, and ornamental. *Krueger Int'l, Inc., v. Nightingale Inc.,* 915 F. Supp. 595, 604-05 (S.D.N.Y. 1996).  At best, a design patent can only help rebut the functionality defense; it cannot do the whole job of proving inherent distinctiveness.  *See Keystone Mfg Co., Inc., v. Jaccard Corp.,* 2007WL 655758 at *8 (W.D.N.Y. 2007)(*quoting Krueger Int'l, Inc., v. Nightingale Inc.,* 915 F.Supp. 595, 605 (S.D.N.Y. 1996)).  Thus, the design patent does not rid Levenger of its burden of proving that the stitching is inherently distinctive.

Levenger provides very little other evidence that the stitching is inherently distinctive.

22

Levenger cites the Narrative testimony of Ms. Van Slyke who states that she "believes" the luxury appearance of the stitching around the outside cover is unique to Levenger and that she has never seen this product before in the world.  Narrative of Van Slyke, ¶ 18.  Levenger also points to the Deposition testimony of Mr. Korros who states that he has never seen this form of "stitched leather-looking cover, stitched to a plastic strip" on a product other than Levenger's.  Korros Deposition, 49:16-24.  Levenger also claims that other notebook companies do not have this stitching design and that Defendant Rollabind is the only company out there, aside from Levenger, with this kind of stitching.  Defendants argue, on the contrary, that this kind of stitching is used by other companies and is primarily functional.  On this record, I find that Levenger has not met its burden of proving that the stitching is inherently distinctive.

Levenger also argues that the box design is inherently distinctive.  The box design is a pattern of three rectangular outlines that appear on each sheet of paper: two narrow rectangular shapes that run across the top of the page and one larger rectangular shape that runs down the left of the page.  The rest of the page is lined.  This design allows notebook users to compartmentalize their notes, but also appears to be partly ornamental.  Once again, I am also not persuaded that this box design is inherently distinctive.  Levenger's only evidence of distinctiveness is that Mr. Korros says that the box design is unique to Levenger.  Korros Deposition, 50:20-51:1.  This is not enough evidence for me to make a finding of inherent distinctiveness.

Not only has Levenger failed to prove that the border stitching and box design are inherently distinctive, it has also failed to prove that these designs have acquired secondary meaning in the marketplace.  The term "secondary meaning" denotes that consumers have

formed an association in their minds between the trade dress and the source or origin of the

product.  *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1536, n.4 (11th Cir. 1986).

Levenger presented very little evidence for this Court to making a finding that consumers

associate the border stitching and the box design with the Levenger name.  On this record, I am

not persuaded that the stitching and boxes have acquired any kind of secondary meaning.

Having determined that Levenger has failed to meet its burden on this prong, Levenger's

claim for trade dress infringement fails.  Levenger has not met its burden of proving that the

border stitching and box design deserve the kind of protection that a finding of trade dress

infringement would provide them.  Therefore, it is unnecessary to determine whether it has

successfully established the required first and second prongs and I therefore decline to address

such.

E. Breach of the License Agreement

The Defendants claim that, even if the patents are found invalid and unenforceable, the

License Agreement is still valid, that Levenger breached the License Agreement by stopping

payment on July 1, 2006, and that they are entitled to royalty payments between the period when

Levenger stopped paying in July of 2006 and when Levenger informed the Defendants that it was

going to challenge the validity and enforceability of the patents on November 10, 2006.

Plaintiff Levenger, in response, argues four separate grounds upon which the Court can

find that not only are Defendants not entitled to any royalties during the time period between July

and November of 2006, but, in fact,, Levenger is entitled to a refund of all royalties it previously

paid prior to July of 2006.  In other words, Levenger is seeking rescission of the License

Agreement.  The four grounds are: (1) invalidity and unenforceability of the patents; (2) fraudulent inducement into the License Agreement; (3) failure of consideration in the License Agreement; and (4) Defendants' material breach of the License Agreement.


1. Refund of royalties due to invalidity and unenforceability of patents

The first ground on which Levenger claims it is entitled to a refund and does not have to pay for royalties between July and November of 2006 is based on the finding that the patents have been declared invalid and unenforceable. This argument fails. Just because the patents themselves are invalid and unenforceable does not mean that Levenger is entitled to any kind of rescission or is absolved from performing its duties under the License Agreement contract.

Although it appears as though the Eleventh Circuit has not considered this exact issue, other Circuits, which have, have found that patent invalidity does not entitle a licensee to a refund of royalties paid prior to bringing suit.  *See Transitron Elctronic Corp. V. Hughes Aircraft Co.,* 649 F.2d 871, 874 (1st Cir. 1981)*; St. Regis Paper Co. v. Royal Industries,* 552 F. 2d 309, 314 (9th Cir. 1977); *Troxel Mfg Co., v. Schwinn Bicycle Co.,* 465 F. 2d 1253,1257-58 (6th Cir. 1972). This means that until a licensee properly repudiates the license agreement, it cannot get a refund for royalties it has already paid, nor is it off the hook for royalties it may still owe under the contract.  *See Studiengesllschaft Kohle, M.B.H. v. Shell Oil Co.,* 112 F.3d 1561, 1568 (Fed. Cir. 1997).  Merely ceasing to make royalty payments is not a sufficient repudiation.  *See PPG Indus., Inc. v. Westwood Chem., Inc.,* 530 F.2d 700, 706 (6th Cir. 1976).  The licensee must also provide notice to the licensor that the reason for ceasing payment is that it intends to challenge

the validity of the patents.  *See id.*

The reasoning behind this rule is that it discourages licensees from waiting to challenge the validity of a patent and as a result, both benefitting from the exclusivity of a patent license agreement and then receiving a refund of the royalties that were paid.  *See Troxel Mfg Co., v. Schwinn Bicycle Co.,* 465 F. 2d 1253,1257-58 (6th Cir. 1972).  For the same reasons, this rule also applies to a finding of unenforceability due to inequitable conduct before the USPTO.  *See Transitron Electronic Corp. V. Hughes Aircraft Co.,* 649 F.2d 871, 875 (1st Cir. 1981).  Thus, as Defendants point out in their post-trial memorandum of law, a claim of unenforceability due to inequitable conduct does not automatically lead to a refund of royalties or let Levenger off the hook for payments prior to repudiation.[3]  Levenger must prove other grounds for the Court to order such a drastic remedy.

In this case, Levenger stopped making payments in July of 2006, but it did not inform Levenger of its intent to challenge the validity or enforceability of the patents until a meeting on November 10, 2006.  Thus, a finding of invalidity and unenforceability does not entitle Levenger to a refund of royalty payment nor does it let Levenger off the hook for royalty payments between July and November of 2006.

2. Rescission due to fraudulent inducement

---

[3]I note that Defendants assert that even if Levenger is able to establish grounds for a refund based on inequitable conduct, they would still be entitled to the royalty payments because the License Agreement covers both the Patents and separate know-how.  Levenger, in response, argues that because the License Agreement does not allocate a separate royalty for know-how, the Defendants would not be entitled to any royalty.  Having determined that Levenger is not entitled to rescission based on invalidity or unenforceability of the patents, it is unnecessary for me to address this issue.

Levenger's second ground for obtaining a refund and getting out of paying royalties between July and November of 2006 is fraudulent inducement. Levenger claims that it is entitled to rescission of the License Agreement due to fraudulent inducement. Under Florida law, the elements of fraudulent inducement are (1) misrepresentation of a material fact, (2) by someone who knew or should have known of the statement's falsity, (3) with intent that the representation would induce another to rely and act on it, and (4) injury suffered in justifiable reliance on the representation. *Florida Evergreen Foliage v. E.I. Dupont de Nemours & Co.,* 336 F. Supp. 2d 1239, 1284 (S.D. Fla. 2004) (*citing Hillcrest Pacific Corp. v. Yamamura,* 727 So.2d 1053, 1055 (Fla. 4th DCA 1999)). Levenger has the burden of proving each element with clear and convincing evidence. *Philadelphia Idem. Ins. Co. V. Kohne,* 294 F. Supp. 2d 1319 (M.D. Fla. 2003); *see Biscayune Boulevard Properties, Inc. V. Graham,* 65 So.2d 858, 859 (Fla. 1953).

Levenger claims that over the course of their eight-year relationship prior to signing the License Agreement, Mr. Feldman repeatedly made misrepresentations about the validity and strength of his Patents, stating that his Patents were valid and that he was able to keep competition out of the United States with them. Levenger claims that these statements were fraudulent because Mr. Feldman knew or should have known that they were untrue based on the fact that he had withheld material information from the USPTO which, if discovered, would render the Patents invalid, and that, in reliance on these statements, Levenger entered into the License Agreement in July of 2004, and has suffered injury as a result.

Defendants argue that Levenger should not be able to assert this claim because it is held to the terms of the License Agreement, which contains both a statement that the Feldmans do not warrant the validity of the Patents and a merger clause. Levenger responds that they are not held

to the terms of the License Agreement because fraud creates an exception to the parole evidence rule notwithstanding the merger clause. *See Lou Bachrodt Chevrolet, Inc. V. Savage,* 570 So. 2d 306, 308 (Fla. 4th DCA 1990); *Nobles v. Citizens Mortgage Corp.,* 479 So. 2d 822, 822 (Fla. 2nd DCA 1985).

      Even if the allegation of fraud does create this exception and would allow Levenger to use extrinsic evidence to prove its claim, Levenger has failed to prove by clear and convincing evidence that it was fraudulently induced into the License Agreement. Specifically, with regard to the second element, Levenger argues that Mr. Feldman knew or should have known that his statements were false because he had already withheld information from the USPTO. This reasoning does not convince this Court. A finding of unenforceability due to inequitable conduct before the USPTO does not create any kind of presumption of fraud on a subsequent patent licensee. *See Transitron Electronic Corp. v. Hughes Aircraft Co.,* 649 F.2d 871, 876 (1st Cir. 1981). Proof of fraud on the patent office may be probative of subsequent fraud in a licensing agreement, but the "ultimate issue is not patent office fraud but fraud on the licensee." *Id.* (*citing Zenith Laboratories v. Carter-Wallace,* 530 F. 2d 508, 513 (3rd Cir. 1976)). Thus, the finding of inequitable conduct before the USPTO does not do very much, without more, to help Levenger prove its claim, especially since the fraud on the USPTO may have been the patent attorney's doing.

      Moreover, with regard to the third element, I find it difficult to believe that Levenger relied on the statements of Mr. Feldman in making its decision to enter into the License Agreement. The License Agreement was entered into at arms length. Not only does the License Agreement appear to be the result of years of thoughtful strategizing on Levenger's part about

how to make the manufacturing of the notebooks more efficient, Levenger's lawyers actually drafted it.  Whether or not Levenger's lawyers did their due diligence before the agreement was entered into is unclear, but what is clear is that Levenger had plenty of opportunity to conduct its own an investigation into the validity and enforceability of the Patents.

On this record, I decline to make a finding of fraudulent inducement into the License Agreement.

3. Rescission due to failure of consideration

The third ground on which Levenger seeks a refund and a way out of paying royalties between July and November of 2006 is failure of consideration.  Levenger argues that the Feldmans utterly failed to support the License Agreement with consideration and that it is, therefore, not in breach of the License Agreement.

Levenger correctly argues that a total failure of consideration renders a contract unenforceable.  *See Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F. 3d 1290, 1311 (11th Cir. 1998); *Hold v. Woodworth,* 271 So. 2d 167, 169-170 (Fla. 4th DCA 1972).  However, Levenger fails to support its argument with a showing that Defendants themselves have totally failed to furnish consideration.  The only evidence that Levenger cites is that the Feldmans promised and represented in Section 4.1 of the License Agreement that there was no impediment to their right to grant a license.  But now, Levenger argues, because of the Court's finding of inequitable conduct before the USPTO, such an impediment does exist.  This subsequent finding, though, does not mean that the Feldmans totally failed to furnish consideration then.  Entering into the License Agreement was a gamble and although Levenger

29

no longer has the benefit of patent protection and the exclusivity that the License Agreement provided in the high end-market, Levenger did reap the rewards of the patent protection and exclusivity during the course of the License Agreement.  For Levenger to now claim that Defendants totally failed to furnish consideration is disingenuous.

Levenger's claim for rescission due to failure of consideration fails.


4. Rescission due to prior material breach

The fourth ground on which Levenger seeks a refund and a way out of paying royalties between July and November of 2006 is prior material breach.  Levenger claims that the Feldmans materially breached the License Agreement by granting "exclusive rights" in the low-end notebook market to multiple third parties that infringed on the "non-exclusive rights" which the Feldmans granted to Levenger in the License Agreement.  Levenger argues that, at a minimum, it is discharged of its contractual duties because of the infringement and, at a maximum, the entire License Agreement should be rescinded because the collective infringements have significantly reduced the value of the contract.  As a legal basis for this claim, Levenger states that Florida law recognizes that "rescission may be granted where a party breaches a term which is an essential part of the bargain between contracting parties such that its breach destroys the entire contract." *Hibiscus Associates Ltd. V. Board of Trustees of the Policemen and Firemen Retirement System of the City of Detroit,* 50 F. 3d 908, 916 (11th Cir. 1995).

Once again, Levenger's statement of the law is correct, but its reliance on such is misplaced.  Levenger is essentially asserting the rights of third parties and has not provided enough evidence on this record for the Court to comprehend how these outside license

30

agreements have harmed Levenger in any way.  Levenger's claim for rescission and for discharge of contractual liabilities based on prior material breach fails.

Thus, based on this analysis, despite the fact that Levenger has prevailed on its claims of patent invalidity and unenforceability, Levenger has not established any grounds which would release it from its contractual obligations under the License Agreement.  Levenger is not entitled to a refund of any of the royalties already paid, nor is it off the hook for royalties owed to Defendants between July and November of 2006.

F. Equitable Accounting

Both parties seek an equitable accounting in this case.  Having denied Levenger's claim for a refund of all royalties paid based on the finding of inequitable conduct before the USPTO and having denied Levenger's claim for rescission of the License Agreement, Levenger has yet another basis for attempting to retrieve some of the money already paid to the Defendants.  Under an equitable accounting, Levenger requests that it be refunded for any overpayments it made to the Defendants for items not covered by the License Agreement,[4] for royalty payments made on items that it had already purchased at selling price, for royalty payments made on items that it purchased from Sun Graphix,[5] and for payments made to Defendants for merchandise that was never received.[6]  Even if the Patents are found invalid, Defendants seek an accounting for unjust enrichment.  They argue that Levenger has accepted, retained, and appreciated the benefit of exclusivity which Defendants conferred on it.  *See Florida Power Corp. V. City of Winter Park,*

---

[4]Levenger seeks a refund of royalties paid on leather covers and punches.
[5]This is the double-dipping issue discussed above.
[6]Levenger also once again asserts its right to either a refund of all royalties paid or rescission of the contract.

887 So. 2s 1237, 1241-42 n.4 (Fla. 2004).  They would like Levenger to pay for this benefit up

until, at the very least, final judgment in this case.

In order to state a claim for equitable accounting, a party must allege that (1) the issues

between the parties are sufficiently complex and (2) that a remedy at law would be inadequate.

*See Bankers Trust Realty, Inc. V. Kluger,* 672, So. 2d 897, 898 (Fla. App. 3 Dist. 1996) (*citing*

*F.A. Chastain Constr., Inc. V. Pratt,* 146 So. 2d 910, 913 (Fla. 3d DCA 1962)).  Moreover, a

court has broad discretion in adapting equitable relief to the circumstances of a particular case.

*See First Family Mortg. Corp. of Florida v. White,* 549 So.2d 1049, 1050 (Fla. App. 3 Dist.

1989).

The parties have not provided, and the Court is unaware of any basis, which would entitle

them to an equitable accounting.  From the record, it appears that a remedy at law in this case is

entirely appropriate.  Levenger alleges that because both parties are seeking an equitable

accounting, it is entitled to a refund for payments it mistakenly made to the Defendants that may

not have been required by the License Agreement.  The Court disagrees and finds that it would,

in fact, be in the interests of justice to bind Levenger to the mistakes it has already made with

regard to the License Agreement.  Additionally, both sides accuse the other of having unclean

hands which would disqualify them from equitable relief.  Given the posture of this case - that

the Defendants' patents are invalid and unenforceable, but nevertheless, they are entitled to a

fixed period of royalties because the License Agreement was breached during the period of time

before Levenger informed Defendants of its plan to challenge the patents - the Court does not

find that either side is entitled to an equitable accounting.

G. Attorney's Fees

Under 35 U.S.C. § 285, a Court "in exceptional cases may award reasonable attorney fees to the prevailing party. *See Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed. Cir. 2001). Exceptional cases are normally those involving bad faith litigation or those involving inequitable conduct by the patentee in procuring the patent. *Id.* at 1375-76 (Fed. Cir. 2001) (*citing Cambridge Prods. Ltd. V. Penn Nutrients Inc.,* 962 F.2d 1048, 1050-51 (Fed. Cir. 1992)); *see also Brooks Furniture Mfg., Inc. V. Cutailier Int'l, Inc.,* 393 F.3d 1378, 1381 (Fed. Cir. 2005). The prevailing party may prove the existence of an exceptional case by showing that inequitable conduct occurred before the USPTO. *Id.* (*Citing Hoffmann-La Roche Inc. V. Invamed Inc.,* 213 F.3d 1359, 1365 (Fed. Cir. 2000)). A prevailing party is defined as a "party in whose favor a judgment is rendered, regardless of the amount of damages awarded." *See Buckhannon Bd. And Care Home, Inc. V. West Virginia Dept.,* 532 U.S. 598, 603 (2001) (*quoting* Black's Law Dictionary 1145 (7th ed. 1999). A prevailing party is one who has been awarded some relief, not necessarily all the relief it requested. *See id.* With this in mind, I award Levenger attorney's fees.

As evidence of its entitlement to attorney's fees, Levenger relies on the finding of inequitable conduct before the USPTO, as well as the conduct of the Defendants during trial. The Court agrees with Levenger that Defendants and/or their attorneys made several incredulous arguments, including Mr. Feldman's repeated attempt to describe the slot in Figure 7 of the Patents as mushroom-shaped as opposed to oval-shaped as well as his attempt to describe the Milos Patent's disk as having flattened sides. Additionally, while Levenger did not prevail on all of its claims, it prevailed significantly on its claims for patent invalidity due to anticipation by

33

prior art and obviousness and patent unenforceability due to inequitable conduct.  Therefore, the Court finds that Levenger is entitled to reasonable attorney's fees for the work that it did on those three claims.

## IV. Conclusion

In conclusion, the Court finds that Claims 1-4 of the 959 Patent and Claims 1,2, and 9 of the 667 Patent are invalid due to anticipation by prior art and obviousness.  The 959 and 667 Patents are unenforceable due to inequitable conduct before the USPTO.  Levenger has not misappropriated any trade secrets, nor has it infringed on the 959 and 667 Patents.  Levenger is not entitled to an injunction against the Defendants for trade dress infringement.  Levenger has breached the License Agreement with the Feldmans and the Feldmans are entitled to royalty payments under the contract during the time period between July 1, 2006 and November 10, 2006.  Levenger is entitled to reasonable attorney's fees for the work that it has done on its claims for invalidity due to anticipation by prior art and obviousness, and unenforceability due to inequitable conduct.

The Court declines to place a value on what each party owes at this time in the hope that the parties can work it out between themselves.  Should they be unable to reach such agreement, both parties shall submit briefings on amounts due under the findings set forth above.

Accordingly, it is hereby

ORDERED and ADJUDGED that the Court finds in favor of Plaintiff on some of its claims and in favor of Defendant on one of its claims.  The Court shall issue a separate final judgment in accordance with these findings.

DONE and ORDERED in chambers in West Palm Beach, Florida, this 21st  day of

September, 2007.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to counsel of record

35